# UNITED STATES DISTRICT COURT
for the
## DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| United States of America | ) | |
| | ) | |
| | ) | Case No. 1:17-CR-030 |
| v. | ) | |
| | ) | |
| Michael Markus | ) | |
| Defendant | ) | |

## DEFENSE MEMORANDUM IN AID OF SENTENCING

Mr. Michael Markus stands before this Court for sentencing following his guilty plea on February 13, 2018 to one count of Civil Disorder in violation of 18 U.S.C. 231(a)(3). Counsel for Mr. Markus urges the Court to impose the thirty-six month sentence recommended by the agreement of the parties, with a one-year term of supervised release to include any treatment or conditions that the Court may deem appropriate. Such a recommendation is appropriate and just in light of the fact that Mr. Markus is a man who has demonstrably overcome the trauma and instability of his family history and youth to lead a life motivated by deep commitment to his spirituality and community.

# I. **Personal Background**

Mr. Markus was born in California in 1972 to James Markus and Kathy Red Cloud.  Mr. Markus is a matrilineal descendant of Chief Red Cloud, a leader[1] of the Oglala band of the Lakota Sioux who helped his tribe to settle on what is now Pine Ridge reservation. The Oglala Lakota are one of the seven bands comprising the "Great Sioux Nation," traditionally known as the Očéti Šakówiŋ, or Seven Council Fires.  Although Mr. Markus is a descendent of Chief Red Cloud, he was raised and baptized as a Mormon with little sense of connection to traditional Lakota ceremonies, language, or culture.  Mr. Markus' mother was raised during the period of time wherein the federal government encouraged native children to assimilate to modern society through the separation and placement of native children at federally funded boarding schools, and during the

[1]See Exhibit 1. Chief Red Cloud was but one of the many chiefs and tribal headsman to sign the 1868 Treaty of Fort Laramie. The treaty contained, among other terms, mutual promises to end hostilities between settlers and the Očéti Šakówiŋ, to change and respect the boundaries of the Great Sioux Reservation  and unceded territory (see Exhibit 2), to punish crimes committed in and against the other nation,  and a covenant by the United States to protect the land and water of the Sioux in exchange for the natives' agreement to move onto the reservation. See Treaty of Fort Laramie 1868, adopted November 6, 1868, 15 Stat. 635.

implementation of the Indian Relocation Act of 1956, a law designed to provide financial incentives for native people to leave reservations in order to acquire "satisfactory employment" and education; in an effort to encourage assimilation into mainstream American society, these incentives were conditioned on native people leaving their tribal life to live in large cities. See Indian Relocation Act of 1956, Pub. L. No. 84-959, 70 Stat. 986. Mr. Markus' mother therefore insisted that Mr. Markus and his siblings speak only English, attend Christian churches, and were forbidden from attending traditional ceremonies or gatherings (to include pow-wows).

Mr. Markus' parents separated early in his life, and he grew up in an unstable environment marked by abuse. Mr. Markus and his sister Michelle moved back and forth between living with maternal relatives on Pine Ridge and their grandmother in California. Mr. Markus has never been close to his father, a non-native who worked in trucking and was incarcerated during Mr. Markus' childhood due to the father's cocaine addiction. Mr. Markus was introduced to alcohol and marijuana at the age of ten, and began abusing substances as a method of coping when he was eleven years old. It was during this time that Mr. Markus recalls the adults in his life ignoring that he had welts "neck to knee" and refusing to take him to a doctor for treatment.

Like many native Oglala children from Pine Ridge, Mr. Markus was removed from his home and sent to a series of schools as a teenager. Mr. Markus began his journey through group homes and boarding schools after his mother broke his nose, called the police, and requested that a bloody Mr. Markus be arrested for assault and removed from her home. Mr. Markus met his father for the first time while at a group home in Huron, Nebraska. Mr. Markus' family from Pine Ridge did not visit him during his time in various homes and boarding schools.

Despite the instability in his family, his early introduction to alcohol and drugs, and the lack of a specific place to call "home," Mr. Markus successfully graduated from Pine Ridge High School in 1990 and immediately enlisted in the Marine Corps. Though he had received a scholarship for an opportunity to play college football, Mr. Markus chose to enlist in the military because he believed that the military would provide him with structure and opportunities that he would not receive as a college football player. Mr. Markus was discharged from the Marine Corps after he sustained an injury to his knee during a training exercise that rendered him unable to perform the exercises required to pass the Marine Corps' rigorous physical fitness exams.

Following his discharge from the military Mr. Markus moved to

4

Scotts Bluff, Nebraska where he received a welding certification from a local community college. During this time Mr. Markus was drinking, somewhat directionless, and ultimately was convicted of burglary in 1994 when he was 22. It was during his time in prison that other indigenous inmates introduced Mr. Markus to traditional Lakota teachings and ceremonies.

Upon his release from prison Mr. Markus continued to learn about his own family's history and their traditional ways that had previously been lost to him and his family.  Between the ages of 22 (Mr. Markus' age on the date of his burglary conviction) and 40 (Mr. Markus' age on the date of his 2012 convictions for Disorderly Conduct and Obstruction) Mr. Markus' only interactions with the court system involved traffic tickets and citations. It was during this time that Mr. Markus quit drinking, obtained his Commercial Drivers License, began to work in long-haul trucking, and committed himself to the "Red Road" - a life dedicated to traditional native values, spiritual practice, and empowerment through connection with ones ancestors and cultural history.

Mr. Markus thus cultivated a spiritual-based family and community in all of the places his new "family" welcomed him into prior to his involvement in the resistance to the Dakota Access Pipeline (DAPL). In the

years immediately preceding Mr. Markus' move to North Dakota he lived on the Pine Ridge reservation where he lived with a friend, Bam Brewer. Mr. Brewer is the owner and proprietor of Indian Action Garage, where Mr. Markus worked repairing vehicles for community members. He participated in food drives based out of the garage wherein he and Mr. Brewer would provide food, a gathering place, and companionship for others living on the reservation at Pine Ridge. The conditions on the reservation are such that wage labor is rare, and the reservation's economy is primarily fueled through various microenterprises such as household-based production of goods and informal activity providing services and commodities to the community in exchange for other goods, services, or accommodations.[2]

## II.   **Instant Offense**

Initially Mr. Markus' involvement in the resistance at Standing Rock was limited to bringing blankets, food, and supplies to the camps located on the banks of Lake Oahe and the Cannonball River. In early September

---

2   See Kathleen Pickering, Alternative Economic Strategies in Low-Income Rural Communities: TANF, Urban Migration, and the Case of the Pine Ridge Indian Reservation, 65 Rural Sociology 1, 148, 159-161 (March 2000). Attached hereto as Exhibit ____

2016, Mr. Markus felt compelled to live at the camps when he saw a video depicting women and children subjected to dog attacks and pepper-spray[3] - he felt it his duty as a United States Marine, a Pipecarrier, and a Sundancer to help protect his people and ancestral lands from harm and desecration.

On October 27, 2016 law enforcement determined that the camps on and near the Cannon Ball Ranch and the pipeline route of work posed a public safety concern and determined it was necessary to move the people gathered there south to another camp located on U.S. Army Corps of Engineers land. While one team of law enforcement planned to travel south down Highway 1806, another team of law enforcement approached Highway 1806 from the west on County Road 134.  Three (3) barricades were constructed on the west side of a small bridge on County Road 134. The barricades were set on fire, resulting in law enforcement having to stop their operation to remove the people gathered on and around the Cannonball Ranch. Mr. Markus was present at the 134 bridge on October 27, and communicated with both law enforcement and others gathered behind the barricades to deescalate the tension between both sides and achieve a nonviolent resolution. See Exhibit ____, Report of Bismarck

[3] See e.g., CBSnews.com, Guards accused of unleashing dogs, pepper-spraying oil pipeline protesters, https://www.cbsnews.com/news/dakota-access-pipeline-protest-turns-violent-in-north-dakota/ (last accessed September 20, 2018).

7

Police Lieutenant Cody Trom, 2-3.

### III.     **Implications for Sentencing**

Mr. Markus is a non-violent and spiritual man who is capable of self-directed change with little supervision, as evidenced by his personal history, the events of the instant offense, and his performance on pretrial release since March 2017.

Mr. Markus is a Sundancer and Pipecarrier (see Docket No. 116, Exhibit 2). At his annual Sundance in August 2016 Mr. Markus learned about protests happening on/near the Standing Rock reservation in North Dakota.  The location of Mr. Markus' offense and where the nearby NoDAPL resistance camp was centered occurred in the territory of the Očéti Šakówiŋ known as the "Unceded Lands" recognized by the United States in the Fort Laramie treaties of 1851 and 1868. 1851 Treaty of Fort Laramie, 11 Stats. P 749. 1868 Treaty of Fort Laramie, 15 Stat. 635. According to Article XVI of the 1868 Treaty, the United States stipulated that this territory would be considered unceded Indian territory (hereinafter "Unceded Lands".) The Očéti Šakówiŋ have never relinquished the Unceded Lands, and Article 10 of the 1868 treaty specifically retains to the Očéti Šakówiŋ the right to roam and occupy the Unceded Lands. To

date, no subsequent Act of Congress has specifically abrogated the specific rights guaranteed by treaty to roam and occupy the Unceded Lands.

The United States Supreme Court has held that specific abrogation is required for abrogation of treaty rights, even if reservation borders have been diminished. See Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172 (1999) (holding that neither an Executive Order attempting to abrogate treaty rights nor a territory's transition into statehood met the requirement to abrogate usufructuary fishing rights outside the border of a reservation guaranteed by an 1937 Treaty). The 8th Circuit Federal Court of Appeals followed this rule in Lower Brule Sioux Tribe v. State of South Dakota, 711 F.2d 809 (1983), holding that the taking of the lands of the Očéti Šakówiŋ under the Flood Control Act for the construction of the reservoirs along the Missouri River (such as Lake Oahe) did not disestablish the territorial boundaries of the Nation, nor did it abrogate the rights reserved under the 1868 Treaty of Fort Laramie to hunt and fish within that territory free from state law. See Klamath Indian Tribe v. Oregon Dept. of Fish and Wildlife, 729 F.2d 609, 612 (9th Cir. 1984); Menominee Tribe of Indians v. United States, 391 U.S. 404 (1968). Similarly, the Tribes were reserved water rights in the Missouri River for their self sufficiency. See Winters v. United States, 207 U.S. 564 (1908), the

9

seminal and still controlling case defining the reservation and distribution of tribal water rights. It was concern for the Standing Rock tribe's water rights and sovereignty that brought people to the camps in southeastern Morton County in 2016-2017 in support of the Očéti Šakówiŋ.

The part of the Unceded Lands where the offense in this case occurred is a specific and sacred site to the Očéti Šakówiŋ. The area of Unceded Lands contains multiple sites revered as sacred by the Očéti Šakówiŋ, to include 82 cultural features and 27 grave sites; the construction of the Dakota Access Pipeline necessarily implicated the disrespect and destruction of land, burial grounds, and indigenous culture. In 1978 Congress passed the American Indian Religious Freedom Act (AIRFA) to recognize, preserve, and protect Native religious practices and access to sacred sites. 42 U.S.C. §1996. In enacting AIRFA Congress recognized the integral, indispensable role that traditional religious ceremonies play in the lives of indigenous peoples across America and the damage inflicted on Native American individuals and communities by the federal government and its various agencies intrusion on and interference with the ability of Native Americans to openly practice ceremony or access sacred sites.

Mr. Markus was born into a family marked by trauma and loss. He managed to overcome the abuse and instability of his childhood to

graduate, join the Marines, and benefit from the prison sentence he served in his twenties by committing to a life dedicated to spirituality and service. He did not come to North Dakota in the fall of 2016 to engage in protest or agitate the police, and on October 27, 2016 Mr. Markus was present on Unceded Lands motivated by a sincere desire to protect spiritually significant sites, ancestral lands, and his community. Lieutenant Trom's report demonstrates that Mr. Markus had no desire to escalate tensions with law enforcement and in fact attempted to negotiate a resolution to the events on the 134 bridge.

Since his indictment in January 2017 Mr. Markus has continued to demonstrate his dedication to developing community and his spiritual practice no matter where he may be. He developed relationships and friendships within the Bismarck community, gathered willow and mole dirt to build his own inipi[4] in which to practice ceremony when prohibited from traveling by his pretrial supervision officer, and worked for his housemate and longtime friend Scott Ellys throughout his time in Cheyenne. The Post-Conviction Risk Assessment (PCRA) contained within PSR prepared in advance of sentencing assessed Mr. Markus as having a Level 3 risk of re-

---

4   Inipi, or sweatlodge, is one of the seven sacred rites in Lakota tradition. For an in-
    depth explanation of various Lakota ceremonies, please refer to Docket No. 147.

offense due in part to what the writer of the PSR characterized as Mr. Markus' homelessness, unstable work/employment history, and lack of social supports. Though it is understandable that the writer of the PSR would interpret the results of the PCRA assessment in a negative light, an understanding of the implications of living and working on the Pine Ridge reservation reveals Mr. Markus to be a self-employed, stable, traditional Oglala man. The tool functionally penalizes Mr. Markus for what are facts of life for nearly every resident of Pine Ridge when the truth is that Mr. Markus is a welcome and integral part of a broader family that is the Očéti Šakówiŋ. The Court should give weight to Mr. Markus' eighteen months of compliance with pretrial supervision, his strong relationships, and his commitment to bettering himself and his community through spiritual practice.

## IV.   <u>Conclusion</u>

Mr. Markus is not a protest leader or an experienced activist; he was and remains an Oglala Lakota man deeply committed to spiritual values and community who engaged in the conduct for which he stands before the Court because he saw the Dakota Access Pipeline as a threat to his people and ancestral lands. Counsel urges the Court to accept and impose the

jointly recommended sentence, allowing for Mr. Markus to transition to a halfway house for the final twelve months of his sentence so that he may adequately prepare to meet the challenges posed by re-entry. Counsel further urges the Court to sentence Mr. Markus to one year of post-release supervision in light of the fact that Mr. Markus has demonstrated his ability to comply with any conditions set forth by the Court and supervision officers. For the foregoing reasons and any others that may appear to this Court, Mr. Michael Markus hereby requests that this Court accept the jointly recommended sentence as well as the defense recommendations for twelve months in a halfway house and one year of post-release supervision in the above-captioned case.

Respectfully Submitted,
MICHAEL MARKUS
By Counsel

Dated: <u>September 20, 2018</u>        <u>/s/ *Sandra Freeman*</u>
SANDRA C. FREEMAN
5023 W. 120th Avenue, #280
Broomfield, Colorado 80020
720-593-9004 (phone)
303-468-9547 (fax)
sandra.c.freeman@protonmail.com

13

<u>CERTIFICATE OF SERVICE</u>

I, Sandra Freeman, hereby certify that I served a true and correct copy of the foregoing document upon the person(s) herein next designated, on the date shown below, by electronically delivering the same at his/her/their last known address(es), to wit:

GARY DELORME, ASSISTANT U.S. ATTORNEY

Dated September 20, 2018.          <u>/s/ *Sandra C. Freeman*          </u>
                                   Sandra C. Freeman